# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Jong Y. Lee,                                         Civil No. 07-4194 (DWF/SRN)

      Plaintiff,

      v.                                     **REPORT AND RECOMMENDATION**

Michael J. Astrue, Commissioner of
Social Security,

      Defendant.

---

    Michael J. Persellin, Esq., Legal Aid Society of Minneapolis, 2929 Fourth Avenue South, Suite 201, Minneapolis, Minnesota 55408, for Plaintiff

    Lonnie F. Bryan, Esq., Office of the United States Attorney, 300 South Fourth Street, Minneapolis, Minnesota 55415, for Defendant

---

SUSAN RICHARD NELSON, United States Magistrate Judge

    Pursuant to 42 U.S.C. § 405(g), Plaintiff Jong Y. Lee seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), who denied Plaintiff's application for disability insurance benefits. This matter has been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. The parties have filed cross-motions for summary judgment. Plaintiff seeks a reversal of the Commissioner's final decision and an outright award of benefits; alternatively, she requests a remand for further proceedings. The Commissioner asks that his decision be upheld in all respects. For the reasons set forth below, the Court recommends that Plaintiff's motion be granted as to her request for a remand but denied as to her request for an immediate award of benefits, and correspondingly recommends that the Commissioner's motion be denied.

# I.    BACKGROUND

## A.    Procedural History

Plaintiff filed her application for disability insurance benefits on November 18, 2005, alleging a disability onset date of November 9, 2003, due to back and neck pain.  (Admin. R. at 50, 65, 78.)  Plaintiff was fifty-nine years old on November 9, 2003.  (Id. at 393.)  Plaintiff's application was denied initially and on reconsideration.  (Id. at 29, 35.)  Plaintiff timely requested a hearing, which was held before an Administrative Law Judge (ALJ) on July 31, 2006.  (Id. at 388.)  The ALJ issued an unfavorable decision on September 18, 2006.  (Id. at 13-23.)  Plaintiff sought review of the ALJ's decision by the Appeals Council and submitted new evidence, but the Appeals Council denied the request for review.  (Id. at 5-8.)  The ALJ's decision therefore became the final decision of the Commissioner.  See 42 U.S.C. § 405(g); Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992).

## B.    Factual Background

Plaintiff is a registered nurse.  (Admin. R. at 401.)  She testified at the administrative hearing that she was first injured in 1976, while working as a nurse at Valley Hospital.  (Id.) After her injury, Plaintiff continued nursing as a weekend job and resumed her education until she received a doctorate degree.  (Id. at 414.)  From 1987 through 1990, Plaintiff was a postdoctoral fellow, paid to teach and research at the University of Minnesota.  (Id. at 78-79, 88.) She continued to work in an unpaid capacity from 1991 through July 1994.  (Id. at 85.)  Plaintiff then became a member of the academic staff and was again paid for teaching and research from August 1994 until October 1998.  (Id. at 85, 89.)  Plaintiff continued this work in an unpaid capacity from November 1998 through November 2003.  (Id. at 85.)  Plaintiff also worked part

time as a nurse from 1990-2000 and full-time as an urgent care specialist from 2000-2003.  (Id. at 79.)  She reinjured her back while lifting a patient in November 2003.  (Id. at 288.)  She tried to return to her nursing job with a lifting restriction in January 2004, but she could not perform computer work due to neck pain.  (Id. at 69, 401-02.)

Plaintiff wore a doctor-prescribed neck collar to the administrative hearing.  (Id. at 395-96.)  She had recently been treated for osteoporosis and testified that she had severe disc problems in her lower back.  (Id. at 396-98.)          Plaintiff testified that she was single and lived alone.  (Id. at 395.)  She had simplified her activities of daily living.  (Id. at 399-400.)  She did very little cooking, shopping, or driving.  (Id. at 399.)  She no longer worked and had exhausted her savings and individual retirement accounts.  (Id. at 402-03.)

**C.      Medical Evidence Pre-dating the Hearing**

Plaintiff was treated by Dr. William Lundberg at Northwest Orthopedic Surgeons on November 28, 2003.  (Id. at 287-88.)  Plaintiff described having a sudden pain in her left shoulder when lifting a heavy patient on November 9, 2003.  (Id. at 288.)  Plaintiff said it hurt her to sleep or do overhead activities.  (Id.)  X-rays were taken and did not show any obvious degenerative change or fracture.  (Id.)  Plaintiff was diagnosed with left shoulder impingement syndrome, treated with an injection, and ordered to rest for two weeks before returning to work. (Id.)  Dr. Lundberg restricted Plaintiff from overhead reaching on the left and from lifting more than twenty pounds on the left.  (Id. at 287.)

Plaintiff saw Dr. Lundberg again on December 10, 2003, and reported that she was having pain in the base of her neck with radiation into the trapezial regions.  (Id. at 286.) Ibuprofen was not helping much, and Plaintiff was being pressured to work more.  (Id.)  On

examination, Plaintiff had impingement signs, but was markedly improved after injection.  (Id.)

She had full cervical range of motion and strength, but with pain and tenderness.  (Id.)  Because

she did heavy lifting as a nurse and work was aggravating her condition, Dr. Lundberg

recommended that she stop working and start seeing a therapist for shoulder and neck exercises.

(Id.)  He also gave Plaintiff a trial of Celebrex.  (Id.)

When Plaintiff saw Dr. Lundberg on January 7, 2004, her shoulder was improved, but her

neck hurt with any movement and with fixing her eyes in one place for too long.  (Id. at 285.)

She also complained of low back, buttock, and thigh pain.  (Id.)  X-rays of her lumbar spine

showed significant degenerative changes at L4-5 and L5-1, but no sign of spondylolisthesis[1] or

spondylolysis.[2]  (Id.)  Dr. Lundberg recommended that Plaintiff do light duty work and continue

with physical therapy.  (Id.)

On January 23, 2004, Dr. Lundberg noted that Plaintiff was having "horrible neck

problems and shoulder problems."  (Id. at 284.)  Dr. Lundberg recommended that Plaintiff

remain off work until they obtained MRIs of her cervical spine and left shoulder.  (Id.)  The MRI

of Plaintiff's cervical spine showed mild degenerative disc disease at C3-4, C4-5, and C6-7, with

no definite spinal canal or neuroforaminal narrowing.  (Id. at 137-38, 283.)  The MRI of her left

shoulder showed some mild tendinopathy and mild degenerative changes.  (Id. at 135-36, 281.)

On April 16, 2004, Plaintiff reported continued left shoulder pain, neck pain, and low

---

[1]  Spondylolisthesis is forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum.  Stedman's Medical Dictionary at 1678 (27th ed. 2000) ("Stedman's").

[2]  Spondylolysis is degeneration or deficient development of a portion of the vertebra. Stedman's at 1678.

4

back pain.  (Id. at 281.)  Dr. Lundberg recommended physical therapy, and he restricted Plaintiff

from work.  (Id.)

Plaintiff was evaluated for hypertension at Fairview University Medical Center on April

15, 2004.  (Id. at 157-58.)  In describing her social history, Plaintiff said that she worked seven

days a week in a research lab, which she loved.  (Id. at 157.)  She reported that all she did was

work and go home.  (Id.)  Plaintiff reported recently trying several medications for elevated

blood pressure.  (Id.)  She stated that she responded well to a beta blocker, with no evidence of

depression, fatigue, or excessive somnolence.  (Id.)  Plaintiff was started on Atenolol for

hypertension.  (Id. at 158.)

In a physical therapy note four days later, Plaintiff reported that she was not working and

that her worst pain was constant headaches.  (Id. at 183.)  She further reported severe difficulty

with lifting and carrying, and moderate difficulty with sitting, walking, driving, bending,

engaging in recreational activities, sleeping, moving her head, dressing, grooming, stair

climbing, squatting, and gripping.  (Id. at 183.)  She reported mild difficulties with standing, sit-

to-stand transferring, and walking.  (Id.)  Physical therapist Matthew Kaufenberg opined that

Plaintiff was unable to work "at this time" secondary to pain levels.  (Id. at 184.)

On June 16, 2004, Plaintiff, accompanied by her Qualified Rehabilitation Consultant

("QRC"), saw Dr. Thomas Conner at Northwest Orthopedic Surgeons.  (Id. at 280.)  Dr. Conner

noted that Plaintiff's work restrictions were outdated, and her workman's compensation benefits

were being denied.  (Id.)  Plaintiff complained of weakness in her head, neck, and arm.  (Id.)

She had difficulty holding her head up for reading, and she did not feel she could work as a nurse

because of left arm weakness.  (Id.)  Her examination revealed satisfactory range of motion and

strength.  (Id.)  Dr. Conner ordered continued therapy and wrote work restrictions for Plaintiff.
(Id.)

In July, Plaintiff saw Dr. Lundberg again.  (Id. at 278-79.)  He noted that Plaintiff was
present with her QRC for left shoulder impingement, cervical strain, and left greater trochanteric
bursitis.  (Id. at 279.)  Plaintiff reported being happy and having increased strength and mobility
from therapy, but she complained of chronic neck pain which prevented her from performing any
type of work.  (Id.)  Dr. Lundberg referred Plaintiff to Dr. James Schwender at Twin Cities Spine
Center.  (Id.)

On August 4, 2004, Plaintiff went to the Fairview University Medical Center.  (Id. at
155.)  She reported feeling weak and having a headache at a level of four out of ten that
worsened with reading and sitting behind a computer.  (Id.)  From Plaintiff's history, Dr. Tanya
Melnik noted that Plaintiff had musculoskeletal symptoms of back pain, neck pain, and
occasional headaches, but no other physical or psychological symptoms.  (Id.)

Plaintiff was diagnosed with osteoporosis on September 9, 2004, at age fifty-nine.  (Id. at
141-42, 144-45.)  She was prescribed Vitamin D and Actonel.  (Id. at 143.)

In September 2004, Plaintiff reported to Dr. Lundberg that she had improved markedly
over the last few months.  (Id. at 277.)  Dr. Lundberg returned Plaintiff to light duty work, with
no heavy repetitive lifting, a ten-pound restriction on her left arm, and minimal overhead work.
(Id.)  He recommended starting half-time work and increasing work as tolerated.  (Id.)  Two
months later, Plaintiff reported pain around the neck and shoulder region.  (Id. at 276.)
However, Plaintiff felt her shoulder was better, and she did not want surgical intervention.  (Id.)
Dr. Lundberg noted that her examination was unchanged, with no focal neurologic deficits.  (Id.)

In December 2004, Plaintiff was diagnosed with hyperparathyroidism[3] and osteoporosis. (Id. at 249-50.)

Plaintiff saw Dr. Schwender on February 3, 2005. (Id. at 193-95.) Plaintiff described having a neck injury in November 2003, which caused neck pain, headaches, and eye pain. (Id. at 195.) Plaintiff reported that Vioxx was helpful, but she was presently taking only Tylenol. (Id.) Upon reviewing MRIs of her cervical spine, Dr. Schwender diagnosed multilevel cervical spondylosis.[4] (Id. at 194.) Dr. Schwender recommended bilateral facet joint injections, which Plaintiff had that day. (Id. at 193-94.)

Plaintiff saw Dr. Susan Evans at Noran Neurological Clinic on March 22, 2005, for low back pain and leg weakness. (Id. at 167.) Dr. Evans noted that Plaintiff was first injured in 1976. (Id.) Plaintiff reported having continued leg weakness and falling. (Id.) Dr. Evans ordered an MRI. (Id.) The MRI of Plaintiff's lumbar spine on March 24, 2005, indicated marked degenerative disc disease at L5-S1 and mild degenerative disc disease at L4-5. (Id. at 168.) There was mild spurring and disc bulging at L5-S1 and mild disc bulging at L4-5, but no evidence of acute disc herniation or spinal stenosis. (Id.)

In a physical therapy report in April 2005, physical therapist Carol Lego noted that Plaintiff was in constant pain, which ranged from a four to a six out of ten. (Id. at 225.) Plaintiff reported that pain affected most of her activities, but that she slept fairly well overall. (Id.)

---

[3] Hyperparathyroidism is a condition due to an increase in the secretion of the parathyroids, causing an elevated serum calcium, decreased serum phosphorous, and increased secretion of both calcium and phosphorous, calcium stones, and sometimes generalized osteitis fibrosa cystica. Stedman's at 853.

[4] Spondylosis is ankylosis of the vertebra. The term is also often applied nonspecifically to any lesion of the spine of a degenerative nature. Stedman's at 1678.

Plaintiff reported using Extra-Strength Tylenol about twice weekly.  (Id.)  Plaintiff also reported

that she continued to work in internal medicine at the University of Minnesota and was a

specialist in hypertension.  (Id.)

Physical therapist Matthew Kaufenberg wrote a discharge summary to Dr. Lundberg on

May 9, 2005, summarizing Plaintiff's progress in physical therapy.  (Id. at 177.)  He stated:

"[Plaintiff] continually reported that PT services were of benefit to her.  She states that without

the therapy services she would be unable to function at home."  (Id.)  Plaintiff reported that

physical therapy afforded her about a one-week reprieve in symptoms; otherwise, it was difficult

for her to open and close doors and windows, lift, or concentrate on tasks like reading and using

a computer.  (Id.)

On June 3, 2005, after ten physical therapy visits at Orthopedic Rehabilitation

Specialists, Inc., Plaintiff reported steady improvement, with her pain reduced by half.  (Id. at

227.)  Ten to twelve additional visits were recommended.  (Id. at 228.)  Later that month,

Plaintiff reported relief from the injections in her neck but also expressed interest in dorsal

rhizotomy.[5]  (Id. at 192.)  Dr. Schwender referred her to Dr. Steven Sabers for treatment.  (Id.)

Plaintiff saw Dr. Schwender for a follow-up appointment on August 10, 2005.  (Id. at

190.)  She reported that her neck pain was worse after being treated by Dr. Sabers.  (Id.)  Dr.

Schwender noted positive findings of shoulder impingement, with cervical range of motion

slightly restricted, but the examination was otherwise normal.  (Id.)  He prescribed exercises.

(Id. at 189.)  He also prescribed a soft collar for plaintiff's neck pain and a TENS unit for her

---

[5]  Rhizotomy is a procedure involving section of the spinal nerve roots for the relief of
pain.  Stedman's at 1568.

lumbar pain.  (<u>Id.</u> at 188-89.)

Plaintiff saw Dr. Lundberg on August 22, 2005 for follow-up on her left shoulder.  (<u>Id.</u> at 275.)  She reported doing well with therapy, but she still had significant impingement signs on examination.  (<u>Id.</u>)  Dr. Lundberg gave Plaintiff an injection in her shoulder and recommended continued therapy, with the possibility of decompression on the left shoulder if she had only short term relief.  (<u>Id.</u>)  Dr. Lundberg continued Plaintiff's no-work restriction.  (<u>Id.</u>)

Plaintiff saw Dr. Schwender again on September 14, 2005, and complained of continued neck pain.  (<u>Id.</u> at 188.)  On examination, her cervical spine range of motion was "well maintained," and she had good strength in her arms.  (<u>Id.</u> at 186.)  Dr. Schwender recommended acupuncture and a Lidoderm patch.  (<u>Id.</u>)

On October 31, 2005, Plaintiff told her physical therapist she was "not too bad today." (<u>Id.</u> at 215.)  She had been able to sit on the ground and weed her garden.  (<u>Id.</u>)  According to a physical therapy note on November 22, 2005, Plaintiff reported that her sciatic pain was still bothering her when working at the lab, but she told her therapist, "I'm maintaining."  (<u>Id.</u> at 216.)  She also reported doing "ok" with acupuncture.  (<u>Id.</u>)  On December 21, 2005, she reported being stressed with "an organizational situation at work."  (<u>Id.</u> at 217.)

Plaintiff saw Dr. Lundberg on December 19, 2005, to follow-up with treatment for her left shoulder.  (<u>Id.</u> at 271.)  Plaintiff continued to have impingement signs, but her range of motion and cuff strength were excellent.  (<u>Id.</u>)  Plaintiff had excellent but only short-term relief from subacromial injections.  (<u>Id.</u>)  Dr. Lundberg recommended left shoulder arthroscopy with subacromial decompression and distal clavicle excision, and Plaintiff agreed.  (<u>Id.</u>)  Plaintiff had surgery on January 20, 2006.  (<u>Id.</u> at 251-52, 270.)  Two weeks after surgery, her range of

9

motion was 90, and Dr. Lundberg recommended aggressive range of motion exercises.  (Id. at 269.)

Plaintiff underwent a consultative physical examination by Dr. Ward Jankus on January 17, 2006.  (Id. at 229-32.)  Plaintiff reported that she was not sure whether physical therapy was helping, but the TENS unit and Lidoderm patches helped a little.  (Id. at 229.)  She reported neck pain all of the time, with the Lidoderm patch reducing the pain from a level eight out of ten to a level four out of ten.  (Id.)  Plaintiff reported sometimes having stiffness, pain, and numbness in her hands.  (Id.)  Plaintiff also reported low back pain and leg buckling that caused her to fall.  (Id. at 230.)  She stated that she could walk a block.  (Id.)  After conducting a physical examination, Dr. Jankus opined:

> From an activity standpoint, based on her straightforward demeanor and stiffness at the neck and to some extent lower back, and MRI scans of the neck documenting multi-level degenerative changes, my impression is that she is going to need a situation where she can frequently change her activity.  I think she is going to have difficulty keeping her head stuck in one position for long periods of time, for example, staring at a computer screen.  She would have a hard time keeping her head forward flexed for long periods of time, for example, looking down at a book, and she basically has to be able to alternate activities somewhat.  She is not able to tolerate forceful pushing and pulling with the upper extremities or overhead activities on a prolonged basis either because of the neck issues.

(Id. at 232.)

On February 17, 2006, Dr. Lundberg indicated that Plaintiff could return to work at a "sit down job" with no use of the left arm "status post decompression [of her left] shoulder."  (Id. at 273.)  Three days later, Dr. Lundberg wrote a note indicating Plaintiff was unable to work for six weeks.  (Id. at 274.)  On examination on February 20, 2006, Dr. Lundberg noted that he could get full range of motion of Plaintiff's shoulder passively, but that she still had impingement signs.  (Id. at 268.)  He also noted that Plaintiff was being treated by Dr. Schwender for a flare-

up of cervical pain radiating down her left arm.  (Id.)

Ms. Lego summarized Plaintiff's physical therapy progress for the time period of April 2005 to January 2006.  (Id. at 320-21.)  Ms. Lego stated that Plaintiff responded extremely well to physical therapy, but that she "occasionally regresses when she is over-active or when the stress of her current job situation provides enough biochemical 'irritants' to inhibit normal spinal mobility."  (Id. at 320.)  Ms. Lego opined that Plaintiff was "typically much safer with her walking, household chores, working at her computer, and with climbing and descending stairs," although she was susceptible to repeat dysfunction.  (Id. at 321.)  Ms. Lego concluded: "[Plaintiff] notes that she is required to be more involved in her work situation and she is discontinuing formal physical therapy at this time.  She has a home exercise program that complements her work . . . ."  (Id.)

Plaintiff underwent a mental health diagnostic examination with Dr. Seymour Gross on May 18, 2006, which continued on July 3, 2006.  (Id. at 349-51.)  Dr. Gross noted that Plaintiff lived alone in public housing, although she had been successful teaching and doing research at the University of Minnesota Medical School until 2003.  (Id. at 349.)  She then developed significant pain in the cervical and lumbar areas and could not use a computer.  (Id.)

Plaintiff completed the Minnesota Multiphasic Personality Inventory-2 test ("MMPI-2"), which indicated that she focused considerably on somatic functioning.  (Id. at 350-51.)  Dr. Gross opined that Plaintiff's preoccupation with her somatic functioning suggested a significant emotional or psychological component.  (Id. at 351.)  Plaintiff's MMPI-2 profile reflected depression and low self worth.  (Id.)  Dr. Gross diagnosed major depressive disorder at a

moderate level and assessed a GAF score of 55.[6]  (Id.)  Dr. Gross opined:

> In addition to the medically documented limitations of her condition, she has
> sustained a severe psychological loss in being able to appreciate her self-worth as
> a person no longer able to engage in the activities that have been virtually her
> entire being.  This is seen as depression that she is also not able to accept since it
> would not fit with her self-image as a person in control of her life and
> contributing to the development of her students.  Emotional problems or
> depression for Ms. Lee usually were self-explained into physical symptoms and
> she would cope that way.  The MMPI-2 result is consistent with the presence of
> underlying depression, and a person who experiences loss and grief and copes by
> denial and unrealistic optimism of recovery to return to her former life style and
> productivity.

(Id.)

On August 17, 2006, Dr. Schwender completed a Physical Capacities Evaluation on

Plaintiff's behalf.  (Id. at 352-53.)  He opined that she could occasionally lift and carry up to five

pounds.  (Id. at 352.)  He also indicated that she has pain with movement of her head, neck,

shoulders, arms, hands, back, legs, and feet.  (Id.)  He opined that Plaintiff was completely

disabled.  (Id.)

**D.     Vocational Expert Testimony**

Juletta Harren testified as a vocational expert (VE) at the hearing before the ALJ.  (Id. at

388, 421-34.)  The ALJ posed a hypothetical question to the VE about whether a fifty-nine to

sixty-one year-old woman could perform her past work if she had more than twenty years of

education, left shoulder decompression surgery, cervical spondylosis, osteoporosis,

hypoparathyroidism, major depressive disorder with a GAF score of 55, light work restrictions,

---

[6]  A Global Assessment of Functioning (GAF) score of 55 may be associated with a
moderate impairment in occupational functioning.  See Cox v. Astrue, 495 F.3d 614, 620 n.5
(8th Cir. 2007) (citing American Psychiatric Association, Diagnostic and Statistical Manual of
Mental Disorders 34 (4th ed. text revision 2000)).

and a left upper extremity restriction of lifting only ten pounds and minimal overhead lifting.

(Id. at 425-26.)  The VE testified that such a person could perform Plaintiff's past job as an

academic instructor, as the job is typically performed in the national economy at the light level.

(Id. at 426.)  Additionally, the VE testified that such a person could not perform Plaintiff's past

work as a nurse, as Plaintiff performed the job, but that there are about 10,000 "light" registered

nursing jobs in Minnesota that such a person could perform.  (Id. at 426-28.)

 The ALJ posed a second hypothetical question, adding the restriction that the person

could not use stairs on more than an occasional basis.  (Id. at 428.)  This did not change the VE's

opinion that such a person could perform Plaintiff's past work.  (Id.)  As a third hypothetical

question, the ALJ added the restriction of no high production goals.  (Id. at 428-29.)  The VE

testified that such a person could not perform Plaintiff's past jobs, which involved high demand

and high concentration.  (Id. at 429.)  The VE testified that such a person, prior to age sixty,

would have transferable skills to other light jobs, including general office clerk.  (Id. at 429-30.)

 Plaintiff's attorney asked the VE whether the hypothetical person could perform her past

work if she were limited to sedentary work.  (Id. at 431.)  The VE testified that such a person

could not perform Plaintiff's past work.  (Id. at 431-32.)  Plaintiff's attorney also asked the VE if

a person could perform the general office jobs she had described if the person did not have the

ability to sit at a computer.  (Id. at 433.)  The VE testified that such a limitation would preclude

all light semi-skilled jobs.  (Id. at 434.)

### E.     The ALJ's Decision

 The ALJ issued an unfavorable decision on September 18, 2006.  (Id. at 13-23.)  In

finding that Plaintiff was not disabled, the ALJ employed the required five-step evaluation,

considering: (1) whether Plaintiff was engaged in substantial gainful activity; (2) whether Plaintiff had a severe impairment; (3) whether Plaintiff's impairment met or equaled an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1; (4) whether Plaintiff was capable of returning to past work; and (5) whether Plaintiff could do other work existing in significant numbers in the regional or national economy.  See 20 C.F.R. § 404.1520(a)-(f).

At the first step of the evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of November 9, 2003.  (Admin. R. at 18.) The ALJ did note, however, that there was evidence suggesting Plaintiff had worked in medical research in the years 2004-2006, which he would consider in assessing Plaintiff's credibility. (Id. at 18-19.)

At the second step of the evaluation, the ALJ found that Plaintiff had severe impairments of degenerative disc disease of the cervical and lumbar spine, cervical strain, left shoulder impingement, status post surgery, osteoporosis, and degenerative joint disease of the left knee. (Id. at 19.)  The ALJ found Plaintiff did not have a severe impairment of depression because there was no evidence that she complained of mental health symptoms before her evaluation by Dr. Gross in May 2006, and she never received any mental health treatment.  (Id.)  The ALJ also cited evidence that Plaintiff could take care of her own household, talked to her brother weekly, attended church, and had been in a chorale group.  (Id.)  Thus, the ALJ found no evidence of a severe mental impairment.  (Id.)

At the third step of the evaluation, the ALJ determined that Plaintiff did not have an impairment or impairments that met or medically equaled one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1.  (Id.)

14

At step four of the evaluation, the ALJ was required to consider Plaintiff's subjective complaints as well as objective medical evidence.  (<u>Id.</u> at 20.)  The ALJ summarized Plaintiff's subjective complaints as neck and back pain resulting in an inability to hold her head up or use her hands and arms.  (<u>Id.</u>)  The ALJ noted that Plaintiff also reported being unable to maintain any position for long, falling frequently because her legs gave out, having constant lower extremity pain, being unable to sleep due to pain, and having difficulty lifting, climbing stairs, reading, and using a computer.  (<u>Id.</u>)

The ALJ found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible.  (<u>Id.</u>)  First, the ALJ noted that Plaintiff reported working in a research lab in 2004, 2005, and early 2006.  (<u>Id.</u>)  The ALJ noted that Plaintiff's MRIs in 2003 and 2004 showed only mild abnormalities, and her physical examinations showed impingement on the left shoulder, with good strength and full range of motion.  (<u>Id.</u>)  Although she was advised to stop working as a nurse doing heavy lifting, she was later released for light work.  (<u>Id.</u>)  The ALJ acknowledged that despite therapy, Plaintiff required left shoulder surgery in January of 2006.  (<u>Id.</u> at 20-21.)  The ALJ concluded that because Plaintiff was not given restrictions regarding her shoulder, post-surgery, in April 2006, the evidence was inconsistent with severe physical restrictions.  (<u>Id.</u> at 21.)  The ALJ further remarked that Plaintiff's physical examinations at the Twin Cities Spine Center and Noran Neurological Clinic yielded no significant findings.  (<u>Id.</u>)  The ALJ found this to be inconsistent with disabling impairments.  (<u>Id.</u>)

The ALJ considered Plaintiff's reported activities to be inconsistent with complete disability because Plaintiff did research work, cared for her daily needs, drove, shop, gardened,

sang in a choir, and attended church services.  (Id.)  Specifically, the ALJ noted that Plaintiff's

complaints of being unable to hold her head up and unable to use her arms were inconsistent

with having normal cervical range of motion and normal upper extremity strength.  (Id.)  The

ALJ also noted that Plaintiff's primary use of over-the-counter pain medications was inconsistent

with allegations of disabling pain.  (Id.)

The ALJ next considered the opinions of Plaintiff's physicians.  (Id. at 22.)  The ALJ

cited Dr. Lundberg's opinion in late 2003 that Plaintiff could perform light work, with additional

restrictions of lifting no more than ten pounds with her left upper extremity and minimal

overhead work.  (Id.)  The ALJ also cited a consulting physician's opinion that Plaintiff should

avoid keeping her head in one position, avoid forceful pushing and pulling with her arms, and

avoid prolonged overhead work.  (Id.)  Finally, the ALJ considered the state agency consulting

physicians' opinions that Plaintiff could perform medium work, with no use of ladders or

scaffolds, only occasional crawling, and no overhead work with the left upper extremity.  (Id.)

In determining Plaintiff's residual functional capacity (RFC) at the fourth step of the evaluation

process, the ALJ concluded:

> The undersigned has considered these opinions in reaching the above conclusion
> that the claimant is restricted to work requiring lifting 20 pounds occasionally and
> 10 pounds frequently, with no lifting over 10 pounds with the left upper
> extremity, and minimal overhead work on the left, and placed the greatest weight
> on the opinion of Dr. Lundberg, as he has been treating the claimant since late
> 2003.
> . . .
> The undersigned notes that in August 2006, Dr. James Schwender, M.D., from the
> Twin Cities Spine Center, opined the claimant would be limited to lifting no more
> than five pounds, and was completely disabled.  (Exhibit 23F.)  However,
> treatment notes from the Twin Cities Spine Center through May 2006 indicate
> slightly reduced to well maintained cervical range of motion, with normal upper
> extremity strength, sensation, and reflexes.  (Exhibits 8F and 20F.)  This evidence
> is inconsistent with a five pound lifting restriction, and with complete disability.

(<u>Id.</u>)

The ALJ noted that Plaintiff worked as an academic instructor from 1979 until 1998.

(<u>Id.</u>)  Based on the opinion of the VE, the ALJ concluded that Plaintiff had the RFC to perform

her past work as an academic instructor, as it is generally performed.  (<u>Id.</u> at 22.)  Thus, at step

four, the ALJ found that Plaintiff was not under a disability as defined in the Social Security Act.

(<u>Id.</u>)

**F.      Appeals Council Review and Additional Medical Records**

Plaintiff sought review of the ALJ's decision by the Appeals Council and submitted

additional evidence for consideration.  (<u>Id.</u> at 11-12.)  The new medical records covered the time

period of August 17, 2006 through June 6, 2007.  (<u>Id.</u> at 4.)

Plaintiff saw Dr. Schwender in September 2006.  (<u>Id.</u> at 355.)  She had recently been

successfully treated with an epidural injection, but her symptoms returned.  (<u>Id.</u> at 355, 357.)

Her pain was primarily in the neck but extended to her face and both upper extremities.  (<u>Id.</u> at

355.)  Dr. Schwender prescribed Lyrica.  (<u>Id.</u>)

Plaintiff began counseling at the Hennepin County Mental Health Center on December 7,

2006.  (<u>Id.</u> at 363-64.)  Psychologist Grant Berg noted that Plaintiff "chooses language which

suggests moral or spiritual overtones in her view of her own depression."  (<u>Id.</u> at 363.)  At the

next session on January 8, 2007, Plaintiff primarily talked about her work history, especially

controversies over credit for research, patents, and publishing.  (<u>Id.</u> at 365.)  Dr. Berg

encouraged Plaintiff to set aside time to engage in some professional reading.  (<u>Id.</u>)

On January 29, 2007, Plaintiff described how she was able to read from paperback books

by setting up pillows and a stand for the book.  (<u>Id.</u> at 366.)  Dr. Berg noted that Plaintiff "is

somewhat of a dichotomous thinker, and I think when she says she is making no progress she probably is telling me that whatever progress she has made, it is not nearly enough." (Id.)  Dr. Berg opined that Plaintiff did not recognize depression as an illness but considered it a moral failing.  (Id. at 366.)

In March 2007, Plaintiff's affect was brighter.  (Id. at 369.)  She was involved in reviewing a scholarly paper.  (Id.)  She also was advising students in the Korean Association for Scientists and Engineers.  (Id.)  She was going to the therapeutic pool two times a week.  (Id.)  Plaintiff admitted that, in retrospect, she had been depressed for a long time, and Dr. Berg concurred.  (Id.)  Plaintiff's mood continued to improve in April, which seemed to be related to pain improvement.  (Id. at 372-74.)

The Appeals Council accepted the additional evidence but declined Plaintiff's request for review.  (Id. at 5-8.)  Therefore, the ALJ's decision became the final decision of the Commissioner.  (Id. at 5.)

## II.   STANDARD OF REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability."  Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992).  "Disability" under the Social Security Act is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 423(d)(2)(A).  The claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  Id.

§ 423(d)(2)(A).

### A.    Administrative Review

If a claimant's initial application for benefits is denied, he or she may request

reconsideration of the decision.  20 C.F.R. § 404.909(a)(1).  A claimant who is dissatisfied with

the reconsidered decision may obtain administrative review by an ALJ.  Id. § 404.929.  If the

claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals

Council, although review is not automatic.  Id. §§ 404.967-981.  The decision of the Appeals

Council, or of the ALJ if the request for review is denied, is final and binding upon the claimant

unless the matter is appealed to a federal district court within sixty days after notice of the

Appeals Council's action.  42 U.S.C. §§ 405(g), 1383(c); 20 C.F.R. § 404.981.

### B.    Judicial Review

Judicial review of the Commissioner's decision is limited to a determination of whether

the decision is supported by substantial evidence in the record as a whole.  Hutsell v. Sullivan,

892 F.2d 747, 748-49 (8th Cir. 1989).  Substantial evidence is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402

U.S. 389, 401 (1971).  The review is "more than a mere search of the record for evidence

supporting the [Commissioner's] finding."  Brand v. Sec'y of Health, Educ. & Welfare, 623 F.2d

523, 527 (8th Cir. 1980).  Rather, "'the substantiality of evidence must take into account

whatever in the record fairly detracts from its weight.'"  Id. (quoting Universal Camera Corp. v.

NLRB, 340 U.S. 474, 488 (1951)).

The reviewing court must review the record and consider:

        1.      The credibility findings made by the ALJ.
        2.      The plaintiff's vocational factors.

3.     The medical evidence from treating and consulting physicians.
4.     The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.
5.     Any corroboration by third parties of the plaintiff's impairments.
6.     The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairments.

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).  A court may not reverse the

Commissioner's decision simply because substantial evidence would support an opposite

conclusion, Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984), and in reviewing the record

for substantial evidence, the Court may not substitute its own judgment or findings of fact,

Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  Instead, the court must consider, "the

weight of the evidence in the record and apply a balancing test to evidence which is

contradictory."  Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).  If it is possible to draw

two inconsistent conclusions from the evidence and one of those positions represents the

Commissioner's decision, the court must affirm that decision.  Robinson v. Sullivan, 956 F.2d

836, 838 (8th Cir. 1992).

## III.    DISCUSSION

Plaintiff alleges several errors in the ALJ's evaluation of her disability claim.  First,

Plaintiff argues the ALJ erred in finding that she does not have a severe impairment of

depression.  Second, Plaintiff contends the ALJ erred in his analysis of her subjective complaints

of pain.  Third, Plaintiff asserts the ALJ improperly discounted her treating physicians' opinions.

Fourth, Plaintiff argues the ALJ erred because credible medical evidence supports a finding that

she is limited to sedentary work.  Fifth, Plaintiff alleges the ALJ erred by relying on VE

testimony in response to a faulty hypothetical question.  Sixth, Plaintiff contends her advanced

age severely limits her transferable skills to other work.  The Court will address these arguments

within the framework of the disability evaluation process, beginning with the ALJ's

determination of Plaintiff's severe impairments at step two.

     **A.**      **Whether the ALJ Erred in Finding Plaintiff's Depression Was Not a Severe Impairment**

     Plaintiff contends that her depression is a severe impairment and adversely impacts her

ability to function in the workplace.  She describes her depression as characterized by social

isolation, insomnia, loss of self-esteem, and excessive focus and magnification of her symptoms

of pain.

     There is a special technique that must be used to evaluate mental impairments at each

level of administrative review.  <u>Pratt v. Sullivan</u>, 956 F.2d 830, 834 (8th Cir. 1992) (citing 20

C.F.R. § 404.1520a).[7]  The steps of the technique must be documented on a Psychiatric Review

---

     [7] 20 C.F.R. § 404.1520a provides in relevant part:

(b) Use of the technique.
(1) Under the special technique, we must first evaluate your pertinent symptoms, signs, and laboratory findings to determine whether you have a medically determinable mental impairment(s). . . . If we determine that you have a medically determinable mental impairment(s), we must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document our findings in accordance with paragraph (e) of this section.
. . .
(c) Rating the degree of functional limitation.
. . .
(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.
. . .
(d) Use of the technique to evaluate mental impairments. After we rate the degree of functional limitation resulting from your impairment(s), we will determine the severity of your mental impairment(s).
(1) If we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that

Technique Form completed by the ALJ, and the form must be attached to the ALJ's decision.  Id. (citing 20 C.F.R. § 404.1520a(d)).  The absence of inquiry into a mental impairment, diagnosis, or treatment prior to applying for benefits weighs against finding there to be a mental impairment.  Clay v. Barnhart, 417 F.3d 922, 929 (8th Cir. 2005).  However, "[the Eighth] circuit has consistently held that an ALJ may not ignore evidence of a psychological origin of pain."  See Benson v. Heckler, 780 F.2d 16, 18 (8th Cir. 1985) (remanding for ALJ to consider somatization and functional disorders under Listing 12.07).

In the present case, although Plaintiff did not seek evaluation or treatment for a mental impairment until May 18, 2006, she submitted evidence of her psychological evaluation by Dr. Gross, who administered diagnostic tests and diagnosed Plaintiff with major depression.  The

---

there is more than a minimal limitation in your ability to do basic work activities (see § 404.1521).
. . .
(e) Documenting application of the technique. At the initial and reconsideration levels of the administrative review process, we will complete a standard document to record how we applied the technique. At the administrative law judge hearing and Appeals Council levels (in cases in which the Appeals Council issues a decision), and at the Federal reviewing official, administrative law judge, and the Decision Review Board levels in claims adjudicated under the procedures in part 405 of this chapter, we will document application of the technique in the decision.
. . .
(2) At the administrative law judge hearing and Appeals Council levels, and at the Federal reviewing official, administrative law judge, and the Decision Review Board levels in claims adjudicated under the procedures in part 405 of this chapter, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

ALJ had Dr. Gross' psychological evaluation of Plaintiff before him when he made his decision.

In evaluating Plaintiff's mental impairments, the ALJ referred to Dr. Gross' diagnosis of major depression, but noted that the record did not contain any complaints of mental symptomatology prior to May 2006 and no evidence of any mental treatment.  The ALJ noted that Plaintiff reported crying, but reported no other depressive symptoms.  The ALJ then noted that Plaintiff lived alone, did her own housework and shopping, talked to her brother weekly, went to church weekly, engaged in research activities in 2004, 2005, and 2006, and had been in a chorale group.  The ALJ concluded: "the undersigned finds no substantial evidence of any severe medically determinable impairment for any continuous 12 month period since November 9, 2003."  (Admin. R. at 19.)

Even though the record shows that the ALJ considered Dr. Gross' evaluation, the ALJ failed to complete a Psychiatric Review Technique Form, and he did not describe his findings under the required procedure for evaluating mental impairments.  The ALJ did not refer to any listed impairment or rate the severity of Plaintiff's symptoms under the four functional areas described in the regulations.  Consequently, the ALJ erred by not following the special procedure under 20 C.F.R. § 404.1520a for evaluating mental impairments.  In addition to not following the special procedure, the ALJ failed to address substantial aspects of Dr. Gross' evaluation.  For example, Dr. Gross opined that individuals with Plaintiff's MMPI-2 profile "are expected to persist in a focus upon [pain] and include considerable depression and sense of hopelessness." (Id. at 351.)  Dr. Gross further stated, "[e]motional problems or depression for [Plaintiff] usually were self-explained into physical symptoms and she would cope that way."  (Id.)  Dr. Gross assigned a GAF score of 55, indicating moderate functional limitations from depression.  The

ALJ's conclusion that the record did not contain evidence of mental symptomatology is incorrect because, as Dr. Gross explained, Plaintiff's depression was externalized into physical symptoms. Plaintiff repeatedly reported suffering significant pain.  Throughout his decision, the ALJ relied heavily on the lack of objective findings to discredit Plaintiff's subjective complaints of the intensity and frequency of her pain, without ever discussing the MMPI-2 results that a person with Plaintiff's psychological profile tends to magnify the intensity of her pain.  In light of the authority that an ALJ may not ignore evidence of a psychological origin of pain, see Benson, 780 F.2d at 18, the case should be remanded.

Upon remand, the ALJ should follow the procedure outlined in § 404.1520a to determine whether Plaintiff has severe impairments of depression or a somatoform disorder.  If, after completing the required procedure, the ALJ determines that Plaintiff has a severe mental impairment, the ALJ should include any functional limitations caused by Plaintiff's mental impairment in his RFC determination, and in doing so, the ALJ should consider whether Plaintiff's subjective physical complaints have a psychological origin.

**B.      Whether the ALJ Erred in His Credibility Analysis and Determination of Plaintiff's RFC**

Plaintiff asserts several errors at step four of the disability evaluation process.  She contends the ALJ improperly discounted her treating physicians' opinions, erred in his analysis of her subjective complaints of pain, ignored medical evidence that she is limited to sedentary work, and propounded an improper hypothetical question to the vocational expert.

**1.      Treating Physicians' Opinions**

Plaintiff identifies several possible errors in the ALJ's analysis of her treating physicians' opinions.  She asserts that neither Dr. Schwender's nor Dr. Lundberg's opinion can be credited

over the opinion of the other, based on length of treatment, because they treated Plaintiff during an overlapping time period for roughly the same amount of time.  Plaintiff challenges the ALJ's reliance on Dr. Lundberg's opinion.  Plaintiff also asserts that the ALJ mischaracterized Dr. Lundberg's opinion by ignoring occasions when Dr. Lundberg found Plaintiff to be incapable of work.  Finally, Plaintiff argues that the ALJ did not discuss Dr. Jankus' opinion that she could not hold her neck in positions for working on a computer or reading.

Medical opinions are evaluated under the framework described in 20 C.F.R. § 404.1527. In according weight to medical opinions, the ALJ should consider the following factors:  (1) the length of the treatment relationship; (2) the nature and extent of the treatment relationship; (3) the quantity of evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; and (5) whether the treating physician is also a specialist.  20 C.F.R. § 404.1527(d).

A treating physician's opinion is typically entitled to controlling weight if it is well-supported by "medically acceptable clinical and laboratory and diagnostic techniques." Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000)).  "The judgment whether a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record requires an understanding of the clinical signs and laboratory findings and what they signify."  Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *1.  "An ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions."  Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001) (citing Prosch, 201 F.3d at 1012-13).

As an initial matter, the Court notes that on remand, the ALJ's consideration of Dr.

25

Gross' opinion and other evidence of Plaintiff's psychological condition could affect the ALJ's assessment of Plaintiff's treating physicians' opinions regarding her physical condition. Nonetheless, the Court will address the specific errors alleged by Plaintiff at this time in order to avoid the possibility of multiple remands.

Plaintiff's alleged physical disability arose from an injury that occurred in November 2003. She was treated by Dr. Lundberg at the time of her injury and thereafter. Plaintiff did not begin treating with Dr. Schwender until February 2005. In the year following Plaintiff's injury, Dr. Lundberg followed Plaintiff's response to various treatments. In September 2004, Plaintiff reported marked improvement from therapy to Dr. Lundberg. The ALJ did not err by concluding that Dr. Lundberg's opinion was entitled to greater weight because the timing of Dr. Lundberg's treatment right after Plaintiff's physical injury is significant. Furthermore, this was not the only factor the ALJ considered in analyzing the opinions of Plaintiff's treating physicians. Consistent with the regulations, the ALJ also considered whether clinical and diagnostic findings supported the treating physicians' opinions. The ALJ specifically mentioned the clinical and diagnostic findings of Dr. Lundberg, whom the ALJ also noted was an orthopedist. (Admin. R. at 20.) The ALJ indicated that the MRIs of Plaintiff's cervical spine and shoulder showed only mild abnormalities. (Id.) The record indicates that Dr. Lundberg reviewed x-rays of her lumbar spine, which showed significant degenerative changes at L4-5 and L5-1, but no sign of spondylolisthesis or spondylolysis. (Id. at 285.) The only other objective finding by Dr. Lundberg was a sign of left shoulder impingement, which continued after physical therapy, and after left shoulder surgery in January 2006. (Id. at 189-90, 268, 271, 275, 286, 288.) The ALJ concluded that this objective medical evidence was inconsistent with total disability. Solely for the purpose of assigning weight to the treating physicians' opinions, the Court agrees that the

clinical and diagnostic findings do not support Dr. Lundberg's restriction from all work on August 22, 2005.  Rather, the objective physical evidence is more consistent with Dr. Lundberg's opinion in September 2004 that Plaintiff could perform light duty work, with a ten-pound left arm lifting restriction, and minimal overhead work on the left.  The Court notes that the ALJ did not ignore the occasions when Dr. Lundberg restricted Plaintiff from all work, but found that Dr. Lundberg's clinical and diagnostic findings were not consistent more severe physical restrictions or complete disability.

The ALJ properly considered the opinions of Dr. Schwender, who reviewed Plaintiff's MRIs and diagnosed multi-level cervical spondylosis.  (Id. at 194.)  On examination, however, Plaintiff's motor strength and reflexes were normal, with only mild limitation in flexion and extension.  (Id.)  Later treatment notes included similar or improved findings on physical examination.  (Id. at 186, 190.)  The Court agrees with the ALJ's conclusion that these clinical and diagnostic findings are inconsistent with Dr. Schwender's opinion that Plaintiff is limited to lifting five pounds and is completely disabled.

Plaintiff asserts that the ALJ failed to address Dr. Jankus' opinion that Plaintiff could not hold her neck in positions to work on a computer or read.  The ALJ did not entirely overlook Dr. Jankus' opinion, but he did not explain his decision to exclude Dr. Jankus' restrictions that Plaintiff should not hold her head in one position for long periods and should avoid forceful pushing and pulling with her arms.  Title 20 C.F.R. § 505.1527(d) provides:  "[r]egardless of its source, we will evaluate every medical opinion we receive."  On remand, the ALJ should more fully explain the basis for the weight assigned to Dr. Jankus' opinion.

### 2.    Plaintiff's Subjective Complaints of Pain

Plaintiff asserts that the ALJ erred in finding her complaints of pain not entirely credible. She notes that she has consistently and frequently been treated for pain since November 2003. She asserts that she has obtained only partial relief from treatment and medications and that her daily activities have been greatly curtailed by pain.  Plaintiff faults the ALJ for focusing on evidence that she worked in a research lab in 2004, 2005, and 2006, and explains that she worked only a single weekend in November 2005.  Relatedly, she contends the ALJ failed to adequately consider her overall, extensive work history.  Finally, Plaintiff notes the existence of a mental health component to her pain.

In the Eighth Circuit, credibility determinations are governed by the factors enunciated in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).  In assessing subjective complaints, an ALJ must consider: "(1) the claimant's daily activities; (2) the duration, frequency[,] and intensity of pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions."  Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (citing Polaski, 739 F.2d at 1322).  Other relevant factors are the claimant's work history and the objective medical evidence.  Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999) (citing Polaski, 739 F.2d at 1322).  "While these considerations must be taken into account, the ALJ's decision need not include a discussion of how every Polaski factor relates to the claimant's credibility." Casey v. Astrue, 503 F.3d 687, 695 (8th Cir. 2007) (citing Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004)).  "The ALJ may discount subjective complaints of pain if they are inconsistent with the evidence as a whole."  Id. (citing Polaski, 739 F.2d at 1322).

As an initial matter, the Court notes that on remand, the ALJ's analysis of Plaintiff's subjective complaints could be affected by Dr. Gross' opinion that there is a mental health

28

component to Plaintiff's pain.  This is especially true because the ALJ relied heavily on the lack of objective physical findings to discredit Plaintiff's subjective complaints concerning the intensity, persistence, and limiting effects of her pain.  The Court will nevertheless assess the ALJ's credibility determination as it currently stands to avoid the possibility of multiple remands.

With respect to Plaintiff's work history, the record demonstrates that Plaintiff worked at the University of Minnesota in 2004, 2005, and 2006.  The record before the ALJ does not support Plaintiff's assertion that she worked only a single weekend in November 2005.  Indeed, as late as March 2006, Plaintiff told her physical therapist that "she [was] required to be more involved in her work situation and she is discontinuing formal physical therapy at this time." (Id. at 321.)  The references to Plaintiff's performance of work after her injury in November 2003 are inconsistent with the extent to which she alleges her daily activities were limited by pain.  Consequently, the ALJ did not err in his consideration of evidence pertaining to Plaintiff's employment at the University of Minnesota in 2004, 2005, and 2006.  On the other hand, the ALJ failed to address Plaintiff's significant, long-term work history, and how deeply affected Plaintiff was by her alleged inability to work, in his overall analysis of Plaintiff's credibility.  On remand, the ALJ should consider Plaintiff's entire work history in his credibility analysis.

As to the objective medical evidence, there are treatment notes evidencing Plaintiff's pain.  However, as discussed in Part III.B.1 above, there was also objective medical evidence weighing against the claimed severity of and limitations resulting from that pain.  An MRI revealed only mild abnormalities in her cervical spine and left shoulder.  Plaintiff was reported as having excellent rotator cuff strength and shoulder motion and was found to have only slightly limited ranges of cervical motion and normal upper extremity strength, sensation, and reflexes.

The ALJ did not err in discounting Plaintiff's credibility in light of this evidence.

Regarding Plaintiff's use of pain medication and the effectiveness of treatment, the ALJ noted that Plaintiff's symptoms often improved with physical therapy and treatment.  The ALJ also noted that Plaintiff only occasionally used prescription pain medication, even though it helped in controlling her symptoms.  "[T]he lack of strong pain medication is inconsistent with subjective complaints of disabling pain."  Richmond v. Shalala, 23 F.3d 1441, 1443-44 (8th Cir. 1994).  Although it may be true that Plaintiff obtained only partial relief from treatment and medications, the ALJ did not err in partially discounting her credibility based on her limited use of pain medication and reports of improvement with treatment.

The ALJ remarked that Plaintiff's daily activities during the relevant time period included working in a research laboratory, performing household chores, shopping, driving, gardening, and attending chorale group rehearsals and church services.  These activities are inconsistent with the claimed severity of Plaintiff's pain.  See Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998); Lawrence v. Chater, 107 F.3d 674, 676 (8th Cir. 1997).  The ALJ did not err in discounting the credibility of Plaintiff's complaints of pain in light of her daily activities.

### 3.     Sedentary Work

Plaintiff alleges that medical evidence establishes she is limited to sedentary work. "Even though the [Residual Functional Capacity] assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." Cox, 495 F.3d at 619-20.  The ALJ's analysis of a claimant's RFC should be based on all of the relevant evidence in the record.  See 20 C.F.R. § 404.1545.  Because remand is required for the ALJ to reconsider Plaintiff's mental impairments, Dr. Jankus' opinion, and  Plaintiff's entire work history, the ALJ's RFC determination on remand should reflect these considerations.  The

Court finds no other errors with the RFC assessment.

### 4.     Vocational Expert Testimony

Plaintiff bases her argument that the hypothetical question posed to the vocational expert was faulty on the assumption that the ALJ should have concluded that Plaintiff was capable of only sedentary work, or that she was incapable of performing work using a computer, or that she would be absent more than two days per month.   An ALJ must include all impairments that he accepts as true in his hypothetical question to the VE.   See Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) ("A hypothetical is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ.").   On remand, the ALJ should include all impairments that he accepts as true in a hypothetical question to a vocational expert to obtain testimony on whether Plaintiff can perform her past relevant work or other work.   The ALJ should also specifically address whether Plaintiff was capable of performing work using a computer and whether she would be absent more than two days per month.

Plaintiff next asserts that the ALJ erred in concluding that she could perform her past relevant work as an academic instructor because her previous work is more properly characterized as a medical researcher.   Plaintiff asserts that even if she had past relevant work as an academic instructor, the ALJ failed to articulate how she would have the special academic knowledge to teach in a field she had not taught in since 1998.   The record indicates that Plaintiff described her work at the University of Minnesota first as teaching and researching as a postdoctoral fellow, and later as a member of the academic staff, spanning the years from 1987-2003.   In the consultative examination with Dr. Gross, she talked about the importance of her students to her.   There is sufficient evidence in the record that Plaintiff worked as an academic instructor, and the ALJ did not err in this respect.   Moreover, under Eighth Circuit precedent, it

was sufficient for the ALJ to analyze Plaintiff's past relevant work as generally required by employers in the national economy, as opposed to how Plaintiff actually performed her job.  See Wagner v. Astrue, 499 F.3d 842, 854 (8th Cir. 2007).  The ALJ did not err in his characterization of Plaintiff's past relevant work.

**C.    Whether the ALJ Erred by Failing to Establish that Plaintiff Could Perform Other Work in the National Economy**

Plaintiff faults the ALJ for not establishing that she could perform other work in the national economy.  She submits that her "advanced age" prohibits her from being able to transfer her skills to other work.  The issues raised by Plaintiff are questions that arise at step five of the sequential evaluation.  See 20 C.F.R. pt. 404, subpt. P, app. 2, § 201.00(f).  However, the ALJ did not reach step five because he concluded that Plaintiff could perform her past work, and therefore was not disabled, at step four.  See 20 C.F.R. § 404.1520(a)(4) ("If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step.").  Vocational factors such as transferability of skills are not considered when determining whether a claimant can perform her past relevant work.  See 20 C.F.R. § 404.1560(b).  Thus, the ALJ did not err in failing to consider Plaintiff's advanced age or transferability of skills.

**IV.    RECOMMENDATION**

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Plaintiff's Motion for Summary Judgment (Doc. No. 8) be **GRANTED IN PART** and **DENIED IN PART**;

2.    Defendant's Motion for Summary Judgment (Doc. No. 15) be **DENIED**; and

3.      This case be remanded to the Social Security Administration for further

proceedings consistent with this Report and Recommendation.


Dated: October 7, 2008

                                        __s/ Susan Richard Nelson_____
                                        SUSAN RICHARD NELSON
                                        United States Magistrate Judge



Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by __**October 22, 2008**__, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.